**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL CASE NOS. 1:10cv98 and 1:10cv198**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **VERSANT PROPERTIES, LLC and** | ) | **Bankruptcy Case** |
| **H&H CHOICE, LLC,** | ) | **No. 08-10930** |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **HUNTLEY CONSTRUCTION** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | **Adversary Proceeding** |
| | ) | **No. 09-01014** |
| **WELLS FARGO BANK, N.A.,** | ) | |
| | ) | |
| Appellee. | ) | |
| _____) | | |

**MEMORANDUM OF DECISION AND ORDER**

**THIS MATTER** is before the Court on the appeals filed by the Appellant

Huntley Construction Company ("Huntley") from the Orders of the Bankruptcy

Court granting a judgment on the pleadings in favor of Wells Fargo Bank, N.A.

("Wells Fargo") and granting Wells Fargo summary judgment. For the

reasons stated herein, the Bankruptcy Court's Orders are affirmed.[1]

## I.     STANDARD OF REVIEW

In reviewing a decision of the Bankruptcy Court, this Court applies the same standards employed by the federal appellate courts. Thus, the Bankruptcy Court's findings of fact are reviewed for clear error, and conclusions of law are reviewed *de novo*. In re Kirkland, 600 F.3d 310, 314 (4th Cir. 2010). The Bankruptcy Court's Orders granting judgment in favor of Wells Fargo, being determinations of law, are subject to a *de novo* standard of review. See Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 154 (4th Cir.) (reviewing grant of judgment on the pleadings), cert. denied, 130 S.Ct. 507, 175 L.Ed.2d 349 (2009); BB&T Corp. v. United States, 523 F.3d 461, 471 (4th Cir. 2008) (grant of summary judgment). The Bankruptcy Court's determination of the issue of judicial estoppel is reviewed for an abuse of discretion. See Moore v. Universal Underwriters Inc. Co., 363 F. App'x 268,

---

[1]In its brief filed in response to Huntley's first appeal from the Order granting Wells Fargo judgment on the pleadings as to Huntley's Crossclaim, Wells Fargo argues that appellate jurisdiction is not proper because Huntley is seeking to appeal an interlocutory order of the Bankruptcy Court without first seeking leave of Court as required by 28 U.S.C. § 158(a)(3). While this first appeal was pending, however, the Bankruptcy Court entered the Order that is the subject of the second appeal, which grants Wells Fargo summary judgment on all claims remaining in the case, thereby disposing of the entire adversary proceeding and rendering its first Order a final judgment for the purposes of 28 U.S.C. § 158(a)(1). Accordingly, the Court properly can exercise appellate jurisdiction over Huntley's first appeal.

269 (4th Cir. 2010); King v. Herbert J. Thomas Mem'l Hosp., 159 F.3d 192, 198 (4th Cir. 1998).

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is reviewed under the same standard employed in reviewing a Rule 12(b)(6) motion to dismiss. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). Thus, the Court must accept the factual allegations of the claim as true and construe them in the light most favorable to the non-moving party. Coleman v. Maryland Court of Appeals, 626 F.3d 187, 189 (4th Cir. 2010), pet. for cert. filed, 79 U.S.L.W. 3480 (Feb. 8, 2011). In order to survive the motion, the "complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Id. A plaintiff therefore must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling [it] to relief, i.e., the 'plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 129 S.Ct. at 1949).

## II.    PROCEDURAL AND FACTUAL BACKGROUND

Taking the well-pleaded factual allegations in Huntley's Crossclaim as true, the following is a recitation of the relevant facts.

In 1999, Cary Harrison and his now deceased wife formed H&H Choice, LLC ("H&H") to hold title to approximately 397 acres of real estate located in Buncombe County, North Carolina (the "Versant Property").   [Versant Complaint, Bankr. Doc. 1 at ¶21].[2] H&H subsequently partnered with Debaran Development ("Debaran") to develop the Versant Property into a luxury real estate community.  [Id. at ¶23].  In October 2005, Debaran entered into a loan agreement with Wachovia Bank ("Wachovia")[3] to borrow up to $24,525,000 for the development of the Versant Property.  [Id. at ¶24; Huntley Crossclaim, Bankr. Doc. 42 at ¶55].  The loan from Wachovia was secured by deeds of trust recorded on October 7, 2005 in the Buncombe County Public Registry. [Wachovia Crossclaim, Bankr. Doc. 40 at ¶61; Huntley Response to Wachovia Crossclaim, Bankr. Doc. 50 at ¶61].  Versant Properties, LLC ("Versant") was created to take over the project and assumed Debaran's obligations under the Wachovia loan.   [Huntley Crossclaim, Bankr. Doc. 42 at ¶56; Versant

---

[2] Documents filed in the underlying bankruptcy proceeding will be hereinafter identified as "Bankr. Doc. __."  Any documents filed in this appeal before the District Court will be identified as "Doc. __."

[3] The Appellee Wells Fargo is the successor by merger to Wachovia.  [See Bankr. Doc. 96 at 3].

Complaint, Bankr. Doc. 1 at ¶25].

On or about October 24, 2005, Huntley contracted with Versant to perform work on the Versant Property related to the grading of roads and the installation of sewer and water lines. [Huntley Crossclaim, Bankr. Doc. 42 at ¶68]. Huntley did not require Versant to obtain payment surety bonds to secure Versant's payment for its work. [See Huntley Response to Wachovia Crossclaim, Bankr. Doc. 50 at ¶81].

The Town of Woodfin has a subdivision ordinance which requires that "[p]rior to approval of a final plat, the subdivider shall have installed the improvements specified in this chapter or guaranteed their installation as provided herein." Woodfin Ordinance § 151.46(A). In the event the subdivider chooses to guarantee installation of the improvements, Woodfin Ordinance § 151.46(B)(1) provides that the town and the subdivider may enter into an agreement "whereby the subdivider shall agree to complete all required improvements." To secure the agreement, the Ordinance further requires the subdivider to provide the Town with a guarantee equivalent to 1.25 times the entire cost of installing all of the required improvements. Id.

In order to obtain final plat approval, Versant elected to proceed under the second option, i.e., it chose to guarantee the installation of the improvements as provided in § 151.46(B). [Id. at ¶60]. To meet its

requirements to the Town Woodfin under the Ordinance, in June 2007,

Versant obtained a letter of credit from Wachovia in the amount of $3,950,000

(the "Letter of Credit") naming the Town of Woodfin as the beneficiary. The

Letter of Credit was issued pursuant to an agreement between Versant and

the Town of Woodfin entitled "Infrastructure Memorandum of Understanding

Regarding Versant Properties, LLC, Phase I Subdivision Plat" (the "MOU").

[Id. at ¶59]. The MOU states, in pertinent part, as follows:

> Versant Properties, LLC has not, as of the date
> hereof, completed the construction of roadways,
> storm water drainage, electric, water and sewer
> services (collectively the "Infrastructure") necessary to
> obtain final approval of the Versant subdivision final
> plat. Versant Properties, LLC and the Town of
> Woodfin have entered into that certain Memorandum
> of Understanding dated 6-6, 2007 (the "Infrastructure
> MOU") setting forth the particular performance criteria
> and deadlines for completion of the Infrastructure. In
> accordance with Section 151.46(B) of the Town of
> Woodfin Land Usage Code Ordinances, the Town of
> Woodfin shall be entitled to the sum of up to
> $3,950,000.00 (representing 1.25 times the entire
> remaining costs of constructing the Infrastructure)
> upon presentation of this Letter of Credit to the issuer
> together with a written statement stating that Versant
> Properties, LLC has failed to perform its obligations in
> the completion of the Infrastructure as set forth in the
> Infrastructure MOU and **an engineer's written
> estimate of the amount needed for the completion
> of the Infrastructure (which shall be the amount
> payable under this Letter of Credit)**.

[MOU, Doc. 42-1 at 53 (emphasis added)].[4]  The Letter of Credit, in turn,

required:

> A DATED STATEMENT ISSUED ON THE
> LETTERHEAD OF THE BENEFICIARY AND
> PURPORTEDLY SIGNED BY AN AUTHORIZED
> REPRESENTATIVE STATING: VERSANT
> PROPERTIES, LLC HAS FAILED TO PERFORM ITS
> OBLIGATIONS IN THE COMPLETION OF THE
> INFRASTRUCTURE AS SET FORTH IN THAT
> CERTAIN INFRASTRUCTURE MEMORANDUM OF
> UNDERSTANDING DATED 06/06/2007 ("MOU") AND
> THAT CERTAIN ENGINEER'S WRITTEN ESTIMATE
> OF THE AMOUNT NEEDED FOR THE
> COMPLETION OF THE INFRASTRUCTURE (WHICH
> SHALL BE THE AMOUNT PAYABLE UNDER THIS
> LETTER OF CREDIT). WE THEREFORE DEMAND
> PAYMENT IN THE AMOUNT (INSERT AMOUNT) AS
> SAME IS DUE AND OWING.

[Letter of Credit, Doc. 42-1 at 55].

Huntley performed various work on the Versant Property, including

building and installing grading for roads, water lines, and sewer lines.

[Huntley Crossclaim, Bankr. Doc. 42 at ¶¶67-68].  In April 2008, however,

---

[4]While the Court generally considers only the allegations of the pleadings in ruling on a Rule 12(c) motion, the Court may consider documents that are "integral to and explicitly relied on in the complaint," so long as there is no question as to the documents' authenticity.  See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999) (discussing Rule 12(b)(6) standard); Eagle Nation, Inc. v. Market Force, Inc., 180 F.Supp.2d 752, 754 (E.D.N.C. 2001) (stating that for purposes of Rule 12(c) motion, "[t]he court may . . . consider the documents and exhibits attached to and incorporated into the pleadings themselves").  As the MOU and Letter of Credit were attached to and referenced in Huntley's Crossclaim, the Court can consider these documents without converting Wells Fargo's motion to one for summary judgment.

Versant began defaulting on its payments to its contractors.  [Id. at ¶69].  As of October 2008, Huntley filed liens against the Versant Property to secure the funds it was owed for the work it had performed in connection with the infrastructure.  [Id. at ¶¶77-80].  Huntley subsequently filed suit to perfect and enforce its liens.  [Id. at ¶81].

In October 2008, the Town of Woodfin made a presentment to Wachovia for the payment of $3,950,000, the full face amount of the Letter of Credit.  [Id. at ¶¶82-83; Doc. 42-1 at 61].  The presentment included a written estimate dated October 8, 2008 from the project engineer, Civil Design Concepts, P.A. ("CDC"), which stated: "We estimate the total funds necessary to complete the Phase I infrastructure at the community known as Versant to be $5,139,411.83 as of the date of this letter."  [Doc. 42-1 at 63].  Wachovia paid the full $3,950,000 to the Town of Woodfin.  [Huntley Crossclaim, Bankr. Doc. 42 at ¶¶82-85].  The draw on the Letter of Credit was done under Town Ordinance § 151.46(B)(2) which provides, in pertinent part, as follows:

> Upon default, meaning failure on the part of the subdivider to complete the required improvements in a timely manner as spelled out in the performance bond or escrow agreement, the surety or the financial institution holding the escrow account shall, if requested by the Board of Aldermen, pay all or any portion of the bond or escrow fund to the town **up to the amount needed to complete the improvements based on an engineering estimate**. Upon payment, the Board of Aldermen, in its discretion, may expend

> such portion of the funds as it deems necessary to complete all or any portion of the required improvements. The town shall return to the subdivider any funds not spent in completing the improvements.

(Emphasis added).

Although Wachovia did not discover this fact until after the Letter of Credit was drawn, the completion estimate provided by the Town of Woodfin and CDC was composed of approximately $4.1 million for infrastructure work which had already been done by the contractors but remained unpaid, and approximately $1 million for infrastructure work remaining to be done on the Versant Property. [See Huntley Crossclaim, Bankr. Doc. 42 at ¶74; see also CDC Crossclaim, Bankr. Doc. 34 at ¶85, Ex. D]. Following the receipt of the Letter of Credit funds, the Town of Woodfin proceeded to finish building the required infrastructure, although the Town has not yet accepted the infrastructure as complete. [Huntley Crossclaim, Bankr. Doc. 42 at ¶85].

On November 14, 2008, Huntley and other contractors filed an involuntary bankruptcy petition against Versant, seeking relief under Chapter 11 of the Bankruptcy Code. [Versant Complaint, Bankr. Doc. 1 at ¶15]. On February 13, 2009, H&H filed a voluntary Chapter 11 petition. [Id. at ¶16].

On June 19, 2009, the Bankruptcy Court granted H&H's motion to transfer a small portion of the Versant Property to the Town of Woodfin free and clear of liens and encumbrances. [CDC Crossclaim, Bankr. Doc. 34 at

¶89].   Included in this property transfer was a water tank, which was constructed by Crom Corporation prior to Versant's default and prior to the payment of the Letter of Credit funds to the Town of Woodfin.  [Id. at ¶¶90, 92].  Following entry of the Bankruptcy Court's June 19, 2009 Order, the Town of Woodfin used funds drawn from the Letter of Credit to pay Crom Corporation approximately $287,000 for work completed at the Versant Property.  [Id. at ¶¶91, 93-94].

On July 23, 2009, Versant filed the present adversary proceeding against various defendants, including the Town of Woodfin, Wachovia, and Huntley.  Believing that the Letter of Credit funds held by the Town of Woodfin would not all be used to finish the infrastructure, Wachovia and Huntley filed claims seeking a ruling from the Court as to how any "residual funds" drawn from the Letter of Credit should be used.  [Wachovia Crossclaim, Bankr. Doc. 40 at 16-17; Huntley Crossclaim, Bankr. Doc. 42 at ¶¶86-87].  Huntley specifically sought a declaratory judgment from the Bankruptcy Court that

> the meaning of the words "complete" and "completion"
> in the context of the Ordinance, the [Letter of Credit]
> and the MOU is comprehensive in nature, including
> not only the cost of physically finishing construction of
> the infrastructure for Phase I of the Versant
> Subdivision but also the cost of making payment to
> those creditors having unpaid bills for construction of
> the infrastructure for Phase I of the Versant
> Subdivision.

10

[Huntley Crossclaim, Bankr. Doc. 42, Second Request for Relief]. Huntley also requested that the Bankruptcy Court direct the Town of Woodfin to use the Letter of Credit funds to finish construction of the infrastructure improvements and then pay the "residual [Letter of Credit] funds on a pro rata basis among the holders of validly perfected and maintained contractors' and materialmen's liens" on the Versant Property. [Id., Third Request for Relief].

In an Order entered April 23, 2010, the Bankruptcy Court denied these requests and granted Wells Fargo judgment on the pleadings on Huntley's Crossclaim. [Order, Bankr. Doc. 105]. Specifically, the Bankruptcy Court concluded that North Carolina General Statute §160A-372(c), which enabled the Town of Woodfin to enact the Ordinances at issue, allows a municipality to use such performance guarantee funds "*solely* to pay expenses incurred on a going forward basis to finish the installation of the infrastructure" and does not permit the use of such funds "for payment to contractors for work previously done." [Id. at 2-3]. Construing the Town of Woodfin Ordinances, the Bankruptcy Court concluded that these Ordinances do not allow for the use of the Letter of Credit funds for payment of contractor invoices for work done prior to the date that the Letter of Credit was drawn, and that if the Ordinances were construed as asserted by Huntley, the Ordinances would be

void and unenforceable.  [Id. at 3].  The Bankruptcy Court further rejected Huntley's contention that Wells Fargo was judicially estopped from pursuing its motion, reasoning that Wells Fargo did not bind itself with regard to any payments of any of the Letter of Credit funds by the Town of Woodfin to Crom Corporation or any other party.  [Id.].

In a subsequent Order entered August 27, 2010, the Bankruptcy Court granted Wells Fargo summary judgment on all remaining claims in the adversary proceeding, including the claims stated in Versant's original Complaint and in Wells Fargo's Counterclaim and Crossclaims.  Finding that the Town of Woodfin had received funds from Wells Fargo over and above what it was entitled to receive, the Bankruptcy Court determined that Wells Fargo is entitled to return of the excess Letter of Credit funds in that: (a) the payment of the excess proceeds to the Town of Woodfin occurred based on a mistake of fact; (b) the Town of Woodfin's draw on the Letter of Credit amounted to a breach of the Letter of Credit contract to the extent that the draw was for more than the amount required to complete the infrastructure; (c) the Town of Woodfin holds the excess proceeds in constructive trust for Wells Fargo; and (d) Wells Fargo is subrogated to the rights of the Town of Woodfin with regard to the excess proceeds.  [Bankr. Doc. 130 at 4].

Huntley now appeals both Orders of the Bankruptcy Court, arguing *inter*

*alia* (1) that the ordinance enabling statute, N.C. Gen. Stat. § 160A-372(c),

authorizes a municipality to use performance guarantee funds to pay

contractors for work previously performed in installing improvements and (2)

that Wells Fargo is judicially estopped from pursuing its motion for judgment

on the pleadings.  [Civil Case No. 1:10cv98, Doc. 6; Civil Case No. 1:10cv198,

Doc. 4].[5]


III.    **DISCUSSION**

   A.    **Interpretation of Woodfin Ordinance § 151.46**

   The Town of Woodfin is a municipal corporation organized under the

laws of the State of North Carolina.  See N.C. Gen. Stat. § 160A-1(2).  As the

North Carolina Supreme Court has explained, municipal corporations

> exist solely as political subdivisions of the State and
> are creatures of statute.   They are authorized to
> exercise only those powers expressly conferred upon
> them by statute and those which are necessarily
> implied by law from those expressly given.  Powers
> which are necessarily implied from those expressly
> granted are only those which are indispensable in
> attaining the objective sought by the grant of express
> power.

Davidson County v. City of High Point, 321 N.C. 252, 257, 362 S.E.2d 553,

_____

[5]Huntley raises additional issues in its appeals of the Bankruptcy Court's Orders. Resolution of the above-cited issues, however, renders these additional issues moot and the Court therefore need not address them herein.

557 (1987) (citations omitted).  Thus, in order to construe the Ordinance at issue, the Court must begin by interpreting the ordinance enabling statute, N.G. Gen. Stat. § 160A-372.  In construing this statutory provision, the Court is mindful that powers that are statutorily granted must be construed strictly. See Davidson County, 321 N.C. at 257, 362 S.E.2d at 557; State v. Scoggin, 236 N.C. 1, 8, 72 S.E.2d 97, 102 (1952).

Section 160A-372 permits a town to adopt subdivision ordinances for the following enumerated purposes:

> (1) "the orderly growth and development of the city";
>
> (2) "the coordination of transportation networks and utilities within proposed subdivisions";
>
> (3) "the dedication or reservation of recreation areas . . . or, alternatively, for provision of funds to be used to acquire recreation areas";
>
> (4) obtaining "rights-of-way or easements for street and utility purposes"; and
>
> (5) "the distribution of population and traffic in a manner that will avoid congestion and overcrowding and will create conditions that substantially promote public health, safety, and the general welfare."

N.C. Gen. Stat. § 160A-372(a).  A town may not enact a subdivision ordinance to serve a purpose beyond those specifically enumerated in the statute. Allred v. City of Raleigh, 277 N.C. 530, 540, 178 S.E.2d 432, 437-38 (1971) ("[t]he power to zone, conferred upon the 'legislative body of a municipality,

is subject to the limitations of the enabling act"); <u>Heaton v. City of Charlotte</u>, 277 N.C. 506, 513, 178 S.E.2d 352, 356 (1971) ("A municipality has no inherent power to zone its territory and possesses only such power to zone as is delegated to it by the enabling statutes....").

Section 160A-372 specifically grants towns the right to accept a "performance guarantee" from a subdivider in lieu of requiring the completion of all improvements prior to final plat recordation and approval:

> The ordinance may provide for the more orderly development of subdivisions by requiring the construction of community service facilities in accordance with municipal plans, policies, and standards. **To assure compliance with these and other ordinance requirements, the ordinance may provide for performance guarantees to assure successful completion of required improvements.** If a performance guarantee is required, the city shall provide a range of options of types of performance guarantees, including, but not limited to, surety bonds or letters of credit, from which the developer may choose. For any specific development, the type of performance guarantee from the range specified by the city shall be at the election of the developer.

N.C. Gen. Stat. § 160A-372(c) (emphasis added).

The terms "performance guarantees" and "completion" are not defined in the statute, nor is the Court aware of any court decision construing their

meaning.[6]   Thus, the Court must resort to the principles of statutory

construction in order to ascertain the meaning of these terms.

The North Carolina Supreme Court has set forth the principles of

statutory construction as follows:

> The principal goal of statutory construction is to
> accomplish the legislative intent. The intent of the
> General Assembly may be found first from the plain
> language of the statute, then from the legislative
> history, the spirit of the act and what the act seeks to
> accomplish. If the language of a statute is clear, the
> court must implement the statute according to the
> plain meaning of its terms so long as it is reasonable
> to do so. <u>Lenox, Inc. v. Tolson</u>, 353 N.C. 659, 664, 548
>
> S.E.2d 513, 517 (2001) (internal citations and
>
> quotation marks omitted).  Thus, the Court first must
>
> determine whether the plain language of the statute at
>
> issue is clear and unambiguous.  "A long-standing
>
> rule of statutory construction declares that a facially
>
> clear and unambiguous statute requires no
>
> interpretation."  <u>Taylor v. City of Lenoir</u>, 129 N.C.App.
>
> 174, 179, 497 S.E.2d 715, 719 (1998).

---

[6]While there are North Carolina cases construing § 160A-372, these cases
predate the 2006 amendment which added the terms "performance guarantees" and
"completion."  <u>See</u> 2005 N.C. Sess. Laws 2005-426.  Prior to the 2006 amendment, the
statute provided that "the ordinance may provide for the posting of bond or any other
method that will offer *guarantee of compliance*."  N.C. Gen. Stat. § 160A-372 (2000)
(emphasis added).

The commonly accepted meaning of "guarantee" is "[t]he assurance that a contract or legal act will be duly carried out." Black's Law Dictionary 772 (9th ed. 2009); see also Webster's Third New Int'l Dictionary 1007 (2002) (defining guarantee as "an agreement by which one person undertakes to secure another in the possession or enjoyment of something"). The term "performance" commonly is defined as "the act or process of carrying out something" or "the fulfillment of a claim, promise, or request." Webster's Third New Int'l Dictionary at 1678. In the legal sense, the term "performance" commonly is defined to mean "[t]he successful completion of a contractual duty...." Black's Law Dictionary at 1252. The term "performance" clearly modifies the term "guarantee" in the statute. Reading these terms together in light of their plain and commonly understood meaning, the plain meaning of the term "performance guarantee" is an assurance or promise that a contractual obligation will be fulfilled.

The term "completion" commonly is defined as "the act or action of completing, becoming complete, or making complete," while "complete" is defined as "possessing all necessary parts, items, components or elements." Webster's Third New Int'l Dictionary at 465. Although "improvement" commonly is defined as "the enhancement or augmentation of value or quality," id. at 1138, an improvement in the legal sense is defined as "[a]n

addition to real property...." <u>Black's Law Dictionary</u> at 826.

Given the plain meaning of these terms, the Court concludes that §160A-372 allows a town to pass an ordinance that provides approval of a subdivision plat upon the guarantee of a third party that the required additions to the real property will be *finished* as required by the plat.

Huntley contends that this construction of the statutory language is too narrow, and that the Court should read this language to require that the required improvements be provided "free of contractors' liens." [<u>See</u> Doc. 6 at 23]. Huntley contends that this construction is appropriate in light of N.C. Gen. Stat. § 160A-4, which provides that the enabling statutes should be "broadly construed" to give towns "adequate authority to execute the powers, duties, privileges, and immunities conferred upon them by law." [<u>Id.</u> at 21]. Where statutory language is clear, however, "it must be given effect and its clear meaning may not be evaded by an administrative body or a court under the guise of construction." <u>State ex rel. Utilities Comm'n v. Edmisten</u>, 291 N.C. 451, 465, 232 S.E.2d 184, 192 (1977). Here, the plain language of the enabling statute provides that the *improvements* must be *completed* before plat approval is given. Nothing in the statutory language suggests, however, that the required improvements must be fully paid for or that they must be free of all liens in order to be considered "complete."

Had the North Carolina legislature intended to require municipalities to seek guarantees assuring full and complete *payment* for all required improvements prior to final plat approval, it could have easily done so by requiring both performance *and* payment guarantees. Similarly, had the legislature intended for the property to be transferred free of liens, it could have included such language within the statute, as it has done in other instances. See, e.g., N.C. Gen. Stat. § 105-374(k) (sale of real property at tax sale to be "free and clear of all interests, rights, claims and liens"); N.C. Gen. Stat. § 20-28.5(b) (sale of impounded motor vehicle to be "free and clear of any liens"); N.C. Gen. Stat. § 25-2A-309(8) (right of lessor to remove fixtures from real property is "free and clear of all conflicting interests of all owners and encumbrancers of the real estate").

Based on the plain language of § 160A-372, the Court concludes that the statute does not authorize municipalities to require subdividers to remove all liens or to pay contractors for all outstanding accounts as a prerequisite for obtaining final plat approval.

The Court's construction of the terms "performance" and "completion" is consistent with the manner in which these terms are used throughout the North Carolina General Statutes. See Regional Acceptance Corp. v. Powers, 327 N.C. 274, 278, 394 S.E.2d 147, 149 (1990) ("Where words of a statute

are not defined, the courts presume that the legislature intended to give them their ordinary meaning determined according to the context in which those words are ordinarily used."). For example, the Little Miller Act, which is codified in Chapter 44, Article 3 of the General Statutes, makes clear that a "performance bond" is considered a separate and distinct obligation from a "payment bond" in the context of public works projects. Under the Act, a performance bond is required to ensure the faithful performance of the contract in accordance with the plans, specifications and conditions of the contract and is issued solely for the protection of the contracting body that is constructing the project. See N.C. Gen. Stat. §44A-26(a)(1). A payment bond, by contrast, is required to ensure the prompt payment for all labor or materials for which a contractor or subcontractor is liable and is issued solely for the protection of the persons furnishing materials or performing labor for the project. See N.C. Gen. Stat. § 44A-26(a)(2). The Act further prescribes different procedures for each type of bond. See, e.g., N.C. Gen. Stat. §§ 44A-27 through 44A-29 (procedures applicable only to payment bonds); Town of Pineville v. Atkinson/Dyer/Watson Architects, P.A., 114 N.C. App. 497, 499, 442

S.E.2d 73, 74 (1994) (noting differences in procedure governing public payment bonds and public performance bonds).

This distinction between "performance" bonds and "payment" bonds is recognized throughout the North Carolina General Statutes. See, e.g., N.C. Gen. Stat. § 143B-472.107(c) (separately listing payment bonds as distinct from performance bonds in statute providing government authority for guarantee of surety bonds under certain circumstances); N.C. Gen. Stat. § 58-31-66 (separately listing payment bonds as distinct from performance bonds in statute forbidding any government entity from requiring contractor to obtain bond from particular surety). The clear distinction between "payment" and "performance" made throughout the General Statutes - a distinction that is universally understood within the construction surety industry - lends support to the Court's conclusion that the term "performance guarantee" refers only to instruments which guarantee to the municipality that the improvements will be *completed*, not to guarantees that contractors who perform work on those improvements will be paid.[7]

---

[7]Indeed, interpreting §160A-372 as permitting a town to require the posting of a payment bond would not make sense since contractors are already statutorily protected through their right to file lien claims against the developer's real property. See generally N.C. Gen. Stat. § 44A-7 *et seq*. The Little Miller Act specifically requires both performance bonds and payment bonds on public construction projects because contractors are prohibited from filing materialmen's liens against public property. See James River Equip., Inc. v. Tharpe's Excavating, Inc., 179 N.C. App. 336, 342, 634 S.E.2d 548, 553-54, disc. rev. denied, 639 S.E.2d 650 (N.C. 2006). Because contractors on private subdivision projects are already protected by their respective statutory lien rights (and therefore do not need a substitute for such a lien), there would be no legitimate public purpose served for a municipal ordinance to require a payment bond from subdivision developers.

Construing the term "completion" to refer to the work performed and not the payment for such work comports with the manner in which the Legislature otherwise uses the term throughout Chapter 160A. For example, a "vested right" is defined in that Chapter as "the right to undertake and complete the development and use of property under the terms and conditions of [a] development plan." N.C. Gen. Stat. § 160A-385.1(b)(6). While a developer needs the "right" to complete the installation of infrastructure improvements in accordance with an approved development plan, no such "right" is needed to pay contractor invoices. Similarly, N.C. Gen. Stat. § 160A-400.24 provides that if a government is to provide public facilities under a development agreement, it must tie the delivery date of those facilities to "performance by the developer in implementing the proposed development (such as meeting defined completion percentages or other performance standards)." See also N.C. Gen. Stat. § 160A-400.25(b) (development agreement must contain "completion" dates); N.C. Gen. Stat. § 160A-417(a)(2) (no permit required for installation of water heater if licensed individual "examines the work at completion"). Each use of the word "completion" in these statutes refers to the *finishing* of the work, not to the payment for it.

Turning now to the Woodfin Ordinance at issue, the Court finds the Ordinance to be clear on its face. The Ordinance allows a subdivider to

obtain final plat approval by either installing the improvements or "guarantee[ing] their installation as provided herein." Woodfin Ordinance § 151.46(A). Based on the plain language of the Ordinance, it is clear that the only thing guaranteed by the subdivider is the "installation" of the improvements, and not the payment for such improvements.

In arguing for a broader interpretation of this Ordinance, Huntley relies on Woodfin Ordinance § 151.65, which provides as follows:

> Each subdivision shall contain the improvements specified in this chapter, which shall be installed in accordance with the requirements of this chapter **and paid for by the subdivider**, unless other means of financing is specifically stated in this subchapter. Each subdivision shall adhere to the minimum standards of design established by this subchapter.

(Emphasis added). Huntley contends that this provision requires at a minimum that the improvements are to be both installed *and* paid for by the subdivider in order for the subdivision to obtain final plat approval. [Huntley Brief, Doc. 6 at 22]. While conceding that there is no explicit reference to liens on the property, Huntley further argues that "[i]t can be fairly inferred from the Ordinance that the improvements should also be free of contractors' liens." [Id. at 23]. There is nothing in this Ordinance, however, which supports Huntley's proposed construction. Woodfin Ordinance § 151.65 simply

provides that it is the subdivider, as opposed to the town or some other government agency, which is to be responsible for payment for the infrastructure. This provision does not prescribe when such payment must be made, nor does it require that the project be free of any liens in order for final subdivision plat approval to be obtained. Even if the Ordinance could be read to include these items, such a requirement would be unenforceable because it is not permitted by the enabling statute.[8]

For the foregoing reasons, the Court concludes that both the ordinance enabling statute, N.C. Gen. Stat. § 160A-372, and the Woodfin Ordinance at issue are clear and unambiguous. By its plain language, § 160A-372 permits a municipality to enact an ordinance allowing a developer to obtain a "performance guarantee to assure successful completion of required improvements." The terms "performance" and "completion" refer to acts of *finishing* the installation of the infrastructure and not to the payment for work previously done by contractors. Thus, while N.C. Gen. Stat. § 160A-372 allows a municipality to draw performance guarantee funds based upon a default of the developer, such funds can be used only to pay expenses

___

[8]Moreover, Huntley's interpretation would create an absurd result in that it would require that all liens, including the first priority lien of ad valorem taxes, consensual liens of deeds of trust, and statutory mechanics' liens, be removed before the development infrastructure was deemed "complete." It is unlikely, however, that any developer would ever be able to comply with such a requirement.

incurred in *finishing* the installation of the infrastructure. They may not be used to pay contractors for work that was previously done.

Because the enabling statute allows municipalities to enact ordinances permitting performance guarantee for the successful "completion" of the installation of infrastructure, and not the payment for such installation, the Court concludes that the Woodfin Ordinance does not allow in this case for the use of the Letter of Credit funds for payment of contractor invoices for work performed prior to the date that the Letter of Credit was drawn. Thus, the Town of Woodfin has no authority to use the Letter of Credit funds to pay contractors for work already performed.

## B.    Judicial Estoppel

Next, Huntley argues that the Bankruptcy Court erred in concluding that Wells Fargo was not precluded by the doctrine of judicial estoppel from taking the position on the Town of Woodfin's use of the Letter of Credit funds to pay Huntley for its unpaid work on the Versant infrastructure based on its acquiescence to the Town of Woodfin's payment of Letter of Credit funds to another contractor, Crom Corporation, for work performed prior to the draw on the Letter of Credit.

"Where a party assumes a certain position in a legal proceeding, and

succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quoting Davis v. Wakelee, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)). This doctrine, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Id. (quoting Pegram v. Herdrich, 530 U.S. 211, 227 n.8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)).

Here, H&H filed a motion in its bankruptcy case on May 7, 2009, seeking to transfer free and clear of liens an approximately .6 acre parcel of the Versant Property to the Woodfin Sanitary Water and Sewer District. [Bankr. Case No. 09-10157, Doc. 40]. Wells Fargo filed a limited objection to that motion. [Id., Doc. 42]. CDC also filed an objection, in which its asked the Court as part of a hearing on the motion, to determine whether the proceeds of the Versant Letter of Credit were "property of the Debtor's estate and/or the estate of Versant" and to prohibit the Town of Woodfin from using those funds for any purpose, including any payment by the Town of Woodfin to Crom Corporation, "without first addressing superior secured lien claims." [Id., Doc.

43]. Wells Fargo objected to CDC's request, arguing that CDC was attempting to "raise issues which were not raised in the Motion" and which could only be raised by an "appropriate pleading" with notice to all interested parties. [Id., Doc. 44]. Wells Fargo further argued as follows:

> [T]o the extent the Court addresses this issue, Wachovia asserts that it is entitled to payment of the Letter of Credit Funds by virtue of being subrogated to the rights of H&H, Versant and/or the Town of Woodfin in accordance with N.C.G.S. § 25-5-117 (among other grounds). Wachovia asserts that neither CDC nor any other lien claimant has any claim against, or right to, the Letter of Credit Funds.

[Id.].

The Bankruptcy Court held a hearing on H&H's motion on June 2, 2009. At that time, CDC requested that the Court deny the motion and put a mechanism in place to address the lien claims. [Transcript, Bankr. Doc. 102-2 at 1]. Counsel for H&H responded that they would file an adversary proceeding to determine "who's entitled to what lien claims and what [to do] about this letter of credit." [Id. at 2]. CDC continued to object on the grounds that the Town of Woodfin might make some payment to Crom Corporation out of the Letter of Credit funds. In response, counsel for Wells Fargo made it clear to the Court its position that the issue of the use of the Letter of Credit funds was not before the Court and should be addressed through an

adversary proceeding.  [Id. at 4].  Counsel for Wells Fargo further argued, in

pertinent part, as follows:

> Mr. Long [counsel for CDC] apparently has an
> objection that the Town of Woodfin is going to pay
> one of the other contractors to make sure that the
> water tower is done and the certification is there, and
> everything of the sort.  Your Honor, that's not
> advancing another contractor over Mr. Long's client.
> Those are funds which come from an entirely
> separate – they aren't the debtor's funds. Every
> bankruptcy court case out there says that the only
> way that a letter of credit draw are funds of the estate
> is if they are excess proceeds over and above the
> amount of the cost of completion.  **The Town of
> Woodfin has said we need to get the water tower
> certified, therefore we need to pay this one
> contractor out of these monies which are not
> property of the estate.  Fine.  That doesn't that**
> [sic] **really has no effect with regard to Mr. Long's
> client.**  It doesn't take an unsecured creditor and
> somehow bootstrap him over Mr. Long's client's
> secured – alleged secured claim.
>
> So that's just the background on that, Your Honor....

[Id. at 4-5 (emphasis added)].  In response, counsel for CDC admitted that its

objection "may reach beyond merely this . . . debtor's motion by introducing

the question of the letter of credit . . . ."  [Id.].  From the bench, the Court

granted H&H's motion to transfer the property but refused to address the

issues regarding the Letter of Credit because "[t]he other issues we can get

to and the debtors, you know, represented that they're going to raise the issue

quickly." [Id. at 6]. On June 19, 2009, the Court entered an Order permitting the transfer of the real property but specifically stated that the Order had "no effect on any claims, counterclaims, cross claims, lien rights, or other rights of any party in interest in this consolidated bankruptcy case." [Bankr. Case No. 08-10930, Doc. 100].

Huntley contends that Wells Fargo's counsel acquiesced to the Town of Woodfin's payment to Crom Corporation during the transfer hearing by stating: "The Town of Woodfin has said we need to get the water tower certified, therefore we need to pay this one contractor out of these monies which are not property of the estate. *Fine*." [Transcript, Bankr. Doc. 102-2 at 5 (emphasis added)]. Viewing this statement in context, however, it is clear that Wells Fargo was not acquiescing to such payment but rather was arguing that such payment was irrelevant to the motion at hand. Reviewing the pleadings and transcripts, it is evident that Wells Fargo has maintained a consistent position throughout these proceedings regarding the use of the Letter of Credit proceeds. Wells Fargo has never approved the Town of Woodfin's payment of the Letter of Credit funds to any party and repeatedly has advanced the argument that it is entitled to a return of those funds. As such, the Bankruptcy Court did not err in refusing to apply the doctrine of judicial estoppel to this case.

## IV.   CONCLUSION

In summary, the Court concludes that the language of N.C. Gen. Stat. § 160A-372(c) is clear and unambiguous and does not permit a town to use a performance guarantee for payment of outstanding invoices owed to contractors.   Accordingly, the Orders of the Bankruptcy Court granting judgment in favor of Wells Fargo are hereby affirmed.


## O R D E R

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that the Order of the Bankruptcy Court granting Wells Fargo Bank, N.A.'s Motion for Judgment on the Pleadings and dismissing Huntley's Crossclaims and the Order of the Bankruptcy Court granting Wells Fargo Bank, N.A.'s Motion for Summary Judgment are hereby **AFFIRMED**.

**IT IS SO ORDERED.**

Signed: March 25, 2011

Martin Reidinger
United States District Judge